UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GERALDINE ROSALES,                      )   No. ED CV 04-1242-PJW
                                        )
                    Plaintiff,          )
                                        )
          v.                            )   MEMORANDUM OPINION AND ORDER
                                        )
JO ANNE B. BARNHART,                    )
COMMISSIONER OF THE SOCIAL              )
SECURITY ADMINISTRATION,                )
                                        )
                    Defendant.          )
_____)

I.

INTRODUCTION

        Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the decision by Defendant Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB").  Alternatively, she asks the Court to remand the case to the Agency for further proceedings.  After reviewing the record and for the reasons discussed below, the Agency's decision is REVERSED and the case is REMANDED for further proceedings.

1                                     II.

2                                BACKGROUND

3          Plaintiff was born on July 10, 1943, and was 60 years old at the

4     time of the administrative hearing.  (AR 46, 482.)  She has an

5     eleventh-grade education and past relevant work as photo-lab helper,

6     highway landscaper, and school bus driver.  (AR 61, 66, 484, 487-88.)

7          Plaintiff filed protectively for DIB on August 27, 2001, alleging

8     disability since November 19, 1997.[1]  (AR 46-48.)  The causes of

9     Plaintiff's alleged disability were a knee injury, a heart condition,

10    diabetes, and depression.  (*See* AR 36, 41.)  After her claim was

11    denied initially and upon reconsideration (*see* AR 36-44), she timely

12    requested a hearing before an administrative law judge ("ALJ").  (AR

13    45.)

14         On October 8, 2003, the ALJ held a hearing.  (AR 482-506.)

15    Plaintiff appeared with counsel and testified.  (*See* AR 482, 484-96.)

16    Additionally, a medical expert and a vocational expert also testified.

17    (*See* AR 496-506.)

18         Plaintiff testified about her general work history and education,

19    stating that her previous jobs had her on her feet most of the time;

20    some of these jobs occasionally required her to lift more than ten

21    pounds or to operate vehicles or heavy machinery.  (*See* AR 484-88.)

22    She added that she last worked in March 2001.  (AR 486.)

23         Additionally, Plaintiff described her medication regimen and her

24    subjective symptoms.  (*See* AR 488-92.)  Before the hearing, she had

25

26    _____

27         [1]  The ALJ noted that the Agency had denied a previous
      application for DIB that Plaintiff filed on January 26, 1999, and
      emphasized that that earlier application was "not being reopened."

28    (*See* AR 11.)

                                      2

1  taken heart, blood-pressure, and diabetes medication.  (AR 488.)

2  Plaintiff also had been prescribed several emergency medications,

3  including nitroglycerine.  (*See* AR 489-90.)  She testified that she

4  had been prescribed medication for pain in her chest, left leg, and

5  shoulder.  (AR 488, 490.)  She added, however, that she suffered

6  breakthrough pain, testifying that the pain in her leg could become so

7  intense that the sensation of the sheet on it would keep her awake at

8  night.  (AR 491.)  Plaintiff also testified that her medications

9  caused some side-effects.  She explained that--although she took her

10 medications as prescribed--she did not take any of her pain medication

11 before the hearing because it made her sleepy.  (AR 488.)  She also

12 added that her medications caused headaches, and made her so "feel

13 drained, and tired, and sleepy" that she need to take a nap most days.

14 (AR 495.)

15     Regarding her living conditions and daily activities, Plaintiff

16 stated that she lived with her adult daughter and her 12-year-old

17 granddaughter.  (AR 492.)  Plaintiff's granddaughter attended grade-

18 school; her daughter was on disability because of "anxiety attacks."

19 (AR 492-93.)  Plaintiff testified that the only chore that Plaintiff

20 did around the house was to clean up her room and occasionally drive

21 her daughter to the grocery store; her daughter did all of the

22 shopping and the other household chores.  (AR 493-94.)  Beyond these

23 things, Plaintiff walked for exercise and kept up with her hobbies,

24 which included painting, woodwork, and floral arranging.  (*See* AR 493-

25 94.)  She added, however, that she could only walk about two blocks

26 slowly before she began to feel pain; she explained that she sometimes

27 had difficulty sitting and could not stand for very long.  (AR 491-92,

28 494.)

1    The medical expert, Dr. Arnold Ostrow, testified next. (AR 496-
2    501.) Dr. Ostrow found that Plaintiff's impairments included bipolar
3    disorder, sclerotic cardiovascular disease, hypertension, diabetes
4    mellitus, and osteoarthritis. (AR 497.) Dr. Ostrow concluded that
5    these impairments did not meet or equal a Listing, either singly or in
6    combination. (AR 497-98.) He opined that Plaintiff retained the
7    following residual functional capacity:

8        She could sit for four hours at a time, a total of six hours
9        in an eight-hour day. She could stand for two hours at one
10       time, a total of three hours in an eight-hour day. And she
11       could walk for three hours at a time, a total of five hours
12       in an eight-hour day. [. . . .] She could lift 20 pounds
13       occasionally, 10 pounds continuously. She could carry 10
14       pounds continuously and 20 pounds occasionally.

15   (*See* AR 498.) Additionally, Dr. Ostrow opined that Plaintiff
16   occasionally could bend or climb stairs. (AR 499.) He added,
17   however, that she should have a "moderate restriction" against driving
18   or working around moving machinery, and a total restriction from work
19   that required stooping or squatting, the use of her left leg for leg
20   controls, the scaling of ropes, ladders, scaffolding, or any work at
21   unprotected heights. (*See* AR 499-500.) Dr. Ostrow agreed that
22   Plaintiff's medications could cause fatigue, and that her pain--if
23   severe enough--could impair her concentration. (AR 500-01.)

24       Finally, the ALJ took testimony from the vocational expert, Kelly
25   Winn-Boaitey. (AR 501-06.) She described Plaintiff's prior relevant
26   work as most analogous to that of photo-lab helper and school bus

27

28

4

driver.  (AR 503.)   The ALJ then provided the background assumptions underpinning all three of the hypothetical questions he would pose to the vocational expert:

> [A]ssume that we have a woman who is 60 years of age, [. . .] and [. . . .] has the education and the work background that [Plaintiff] has.  [. . . .]  [A]ssume that she would be able to sit four hours at a time up to six hours a day, and walk three hours at a time up to five hours a day.  She would be limited in lifting and carrying [up] to [. . .] 20 pounds on an occasional basis and 10 pounds on a frequent basis.  [. . .]  [A]ssume further that she has a problem with her left knee so she would have a limitation on the pushing and pulling of leg controls and [. . .] she should avoid pushing and pulling of the leg controls [. . .] with her left leg.  [. . . .]  [S]he should avoid stooping and squatting.  She [. . .] can occasionally bend.  [. . .]  [S]he can occasionally crawl.  She can occasionally climb stairs but she should avoid climbing ropes, ladders, and scaffolds.  She should avoid working at unprotected heights.  [. . .]  [T]here would be a moderate restriction on her working around moving machinery and driving automobile equipment although she [. . .] does drive automobiles.  [. . .]  [A]ssume further that this hypothetical person would have no restrictions with respect to any marked changes in temperature and humidity or any exposure to dust, fumes, and gasses.  [. . .]  [A]ssume further that this hypothetical person has some pain.  She has pain in her chest and in her back and her leg.

1   (*See* AR 503-04.)   Having laid the groundwork for all of the
2   hypothetical questions, the ALJ then provided the specific assumptions
3   for the first question:

4         For the first hypothetical I want you to assume that that
5         hypothetical person has a slight level of pain [. . .] and
6         it would have a slight effect on her ability to do basic
7         work activities.  This [. . .] person also has some
8         depression, hypertension, and diabetes[,] all of which would
9         have a slight effect on her ability to do basic work
10        activities for they are controlled or can be controlled by
11        appropriate medication without any significant adverse side
12        effects.

13  (*See* AR 504.)   The expert opined that this first hypothetical person
14  could perform Plaintiff's former job as a photo-lab helper, but none
15  of her other work.  (AR 505.)   The ALJ then posed his second
16  hypothetical question:

17        [A]ssume hypothetical person #2.  All factors are the same
18        except now the pain is more of a moderate nature and would
19        normally have a moderate effect on her ability to do basic
20        work activities.  However, the pain is or can be controlled
21        by appropriate medication without any significant adverse
22        side-effects.

23  (AR 505.)   The vocational expert stated that this second hypothetical
24  person still could perform Plaintiff's previous work as a photo-lab
25  helper.  (AR 505.)   The ALJ then posed the last of his three
26  hypothetical questions:

27        [For] [h]ypothetical person #3 all factors are the same
28        except now we have severe pain.  And the pain is so severe

6

1    that there is no amount of pain medication that will help
2    alleviate that pain or if it does then the side effects of
3    the pain medication are so significantly adverse that they
4    would markedly interfere with the ability to maintain pace
5    and concentration.

6  (AR 505.)  The vocational expert opined that this third hypothetical
7  person could neither perform any of Plaintiff's prior jobs, nor any
8  other substantially gainful work in the national economy.  (AR 505.)
9  Counsel waived questioning of this expert, and the ALJ adjourned the
10 hearing.  (AR 506.)

11     The ALJ issued his decision under the five-step sequential
12 process on December 22, 2003.  (See AR 11-18.)  At step one, he
13 determined that Plaintiff had not engaged in substantial gainful
14 activity since her alleged onset date.  (See AR 12.)  At steps two and
15 three, he concluded that Plaintiff suffered from osteoarthritis of the
16 left knee, atherosclerotic heart disease, hypertension, and diabetes
17 mellitus--impairments that were all "severe" within the meaning of the
18 regulations, but not severe enough to meet or equal a Listing-level
19 impairment.[2]  (AR 14.)  After summarizing the medical evidence, the
20 ALJ adopted the medical expert's assessment of Plaintiff's residual
21 functional capacity.  (Compare AR 12-16 with AR 498-500.)  At step
22 four, the ALJ accepted the vocational expert's opinion that a person
23 with Plaintiff's limitations could return to her former work as a

24

25 _____

26    [2]  The ALJ also noted that Plaintiff suffered from bipolar
   disorder, but explained that this impairment only "resulted in mild
27 restrictions in daily activities, mild difficulties in social
   functioning, and mild difficulties in maintaining concentration,
28 persistence or pace."  (AR 14.)

1  photo-lab assistant.[3]  (*See* AR 16.)  On the basis of that testimony,

2  the ALJ found that Plaintiff was not disabled without proceeding to

3  step five of the sequential process.  (AR 17.)

4      Plaintiff timely sought review of the ALJ's decision.  (AR 7.)

5  On August 26, 2004, the Appeals Council denied Plaintiff's Request for

6  Review, and the decision of the ALJ became the final decision of the

7  Agency.  (*See* AR 4-6.)  On October 14, 2004, Plaintiff filed her

8  Complaint in this Court.  On June 3, 2005, the parties filed a Joint

9  Stipulation ("Joint Stip.") setting forth the contested issues.

10                              III.

11                       STANDARD OF REVIEW

12      "Disability" under the applicable statute is defined as the

13  inability to perform any substantial gainful activity because of "any

14  medically determinable physical or mental impairment which can be

15  expected to result in death or which has lasted or can be expected to

16  last for a continuous period of not less than twelve months."  42

17  U.S.C. § 1382c(a)(3)(A).  The Court may overturn the ALJ's decision

18  that a claimant is not disabled only if the decision is not supported

19  by substantial evidence or is based on legal error.  *See Magallanes v.*

20  *Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

21      Substantial evidence "'means such relevant evidence as a

22  reasonable mind might accept as adequate to support a conclusion.'"

23  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison*

24  *Co. v. NLRB*, 305 U.S. 197, 229 (1938).)  It is "more than a mere

25

26      [3]  The ALJ did not make clear whether she considered Plaintiff's
    limitations to match those of her first or second hypothetical person,
27  although from the decision it is evident that the ALJ must *not* have
    considered the third hypothetical person's limitations to be apt.
28  (*See* AR 16-18.)

                              8

scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), and "does not mean a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

IV.

DISCUSSION

Plaintiff claims that the ALJ erred in three respects. First, she criticizes the ALJ for failing to discuss the Third Party Questionnaire completed by her sister, Ms. Linda Wedgworth. (*See* Joint Stip. at 5-7.) Second, Plaintiff claims the ALJ erred "by failing to properly evaluate the evidence in regards to the Plaintiff's alleged side effects of her medications." (Joint Stip. at 7-8.) Third, she faults the ALJ for neglecting to discuss the opinion of disability supposedly rendered by Dr. David Wood, a treating physician. (*See* Joint Stip. at 3-4.)

Each of Plaintiff's specific substantive arguments will be addressed separately in the order listed above (which differs from the order in which they are briefed). As explained below, the Court concludes that remand for additional proceedings is necessary.

A.    The ALJ Improperly Ignored Lay Evidence

Plaintiff contends that the ALJ erred at step three of the sequential process when he ignored a third-party questionnaire completed by Plaintiff's sister. (*See* Joint Stip. at 5-7.) The record reflects that, indeed, the ALJ did not address this questionnaire. (*See* AR 11-18.) The Court concludes that this was error.

"[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence, and therefore *cannot* be disregarded without comment." *Nguyen v. Chater*,

9

100 F.3d 1462, 1467 (9th Cir. 1996)(italics in original and citations omitted).  This is merely a specific instance of the general rule that an ALJ must "consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  Moreover, pursuant to *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993), an ALJ must give reasons germane to a lay witness's testimony before discounting it.  An ALJ is, however, permitted to reject lay testimony if he gives legitimate reasons for doing so.  *See Nguyen*, 100 F.3d at 1467.

In this case, Linda Wedgworth, Plaintiff's sister, completed a questionnaire.  (*See* AR 84-90.)  Among other things, Ms. Wedgworth stated in it that Plaintiff shops "when able," but added that "[s]he becomes tired and needs to rest because of pain."  (AR 86.) Additionally, Ms. Wedgworth noted that Plaintiff's social activities had "changed dramatically" because of her "limited mobility," which sometimes requires the use of a cane.  (AR 87, 89.)  Finally, Ms. Wedgworth noted that Plaintiff displayed symptoms of depression, including loneliness and a tendency to isolate herself.  (AR 86, 89-90.)

"[I]n interpreting the evidence and developing the record, the ALJ does not need to discuss every piece of evidence," particularly "evidence that is neither significant nor probative."  *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003)(citations and internal quotation marks omitted).  In this particular case, however, Plaintiff testified without contradiction that she suffered from fatigue, headaches, and depression.  (*See* AR 493, 495.)  Given Ms. Wedgworth's relationship with Plaintiff, her insights were highly probative--not only of Plaintiff's daily level of functioning, but

also of her credibility as to her subjective symptoms.  The ALJ's

failure to explain why he rejected Ms. Wedgworth's statements was,

therefore, erroneous.  *See Dodrill*, 12 F.3d at 919 (concluding that

the ALJ erred by failing to clearly and specifically articulate the

basis for his rejection of a lay opinion); *see also Sprague*, 812 F.2d

at 1232 (noting that the ALJ's disregard of lay evidence "violates the

Secretary's regulation that he will consider observations by

non-medical sources as to how an impairment affects a claimant's

ability to work")(citation omitted).

     As the Agency argues, however, Plaintiff has not challenged the

ALJ's finding that her own testimony was "not entirely credible."

(*See* Joint Stip. at 7; *see also* AR 17.)  On the assumption that the

ALJ's credibility determination was sufficiently detailed, and on the

logic that Ms. Wedgworth's statements were "cumulative" of Plaintiff's

testimony, the Agency urges the Court to find that the ALJ's adverse

credibility determination relating to Plaintiff was broad enough to

subsume any other evidence cumulative of it--including Ms. Wedgworth's

Third-Party Questionnaire.  (*See* Joint Stip. at 7.)  The Court

declines the invitation.

     "Credibility determinations are," of course, "the province of the

ALJ."  *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  But

whenever an ALJ's disbelief of a claimant's testimony is a critical

factor in a decision to deny benefits, as the Agency suggests it was

here, the ALJ must make *explicit* credibility findings.  *See Rashad v.*

*Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990).  As a practical matter,

this means that "the ALJ must specifically identify the testimony she

or he finds not to be credible and must explain what evidence

undermines the testimony."  *Holohan v. Massanari*, 246 F.3d 1195, 1208

11

(9th Cir. 2001)(citation omitted); *see also Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)(holding that, if a claimant who alleges disability based on subjective symptoms produces objective medical evidence which could reasonably be expected to produce some level of symptoms and there is no evidence of malingering, an "ALJ can reject the claimant"s testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so").[4]   The "specific, clear and convincing" standard is the most demanding required in Social Security cases; indeed, it is the same standard that an ALJ must meet in order to reject the uncontradicted opinion of a treating physician. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).   Thus, a decision resting on an "implicit" adverse credibility determination cannot stand. *See Albalos v. Sullivan*, 907 F.2d 871, 874 (9th Cir. 1990).

In Plaintiff's case, the ALJ ultimately found that her "allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision." (AR 17.)   A murky explanation of the ALJ's rationale appears earlier in the decision, where he noted:

> [Plaintiff's] assertions as to the extent, intensity, and
> duration of her alleged subjective symptoms and functional
> limitations and restrictions are not entirely credible
> because of significant inconsistencies in the record as a

---

[4]   *Accord* Social Security Ruling ("S.S.R.") 96-7p (1996) (explaining that an ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record," and be "sufficiently specific" to inform subsequent reviewers of both the weight the ALJ gave a claimant's statements and the reasons for that weight).   Social Security Rulings are binding on the ALJ. *See* 20 C.F.R. § 402.35(b).

whole.  Diagnostic studies confirm degenerative changes in [Plaintiff's] left knee.  However, examinations have disclosed that her gait is intact, and that she does not require an ambulatory device.  [Plaintiff] testified that she has no problems standing, and that she walks for exercise.  [Plaintiff] has not required surgery within the relevant period at issue as a result of ongoing pathology of the left knee, nor has she required prolonged participation in a pain clinic or other extensive medical measures to control her complaints of pain.  The record is devoid of the need for other significant modes of treatment such as repeated periods of hospital confinement, emergency room care, or significant office care other than periodic follow up for medications and maintenance because of exacerbations of her medical conditions.  There is no evidence of significant adverse side effects from medications impacting her ability to engage in work related tasks.  As noted herein, [Plaintiff's] activities with respect to her daily activities have not been significantly affected by her impairments of record.  She leads a relatively active lifestyle with activities typical of most individuals.
(AR 15.)  The decision contains no other reasons for the adverse credibility finding.  (*See* AR 11-18.)

Ordinarily, this Court will not scrutinize an adverse credibility finding unless the claimant challenges it.  *See Solomon v. Secretary of Health and Human Services*, No. 91-CV-77171 DT, 1992 WL 478586, at *2 (E.D. Mich. Aug. 13, 1992)("The Plaintiff has not challenged the ALJ's determination of her credibility, and the Court accepts it as

13

1 accurate."). Here, however, the *Agency* brings the validity of the
2 ALJ's credibility determination into issue by using it to support the
3 ALJ's failure to consider Ms. Wedgworth's opinion. (*See* Joint Stip.
4 at 7.) In this circumstance, the Court is compelled to consider the
5 soundness of the credibility determination.

6     A review of the record confirms that the reasons given by the ALJ
7 for rejecting Plaintiff's testimony were not sufficiently "specific,
8 clear and convincing" in light of the range of impairments for which
9 there is substantial evidence. *See Smolen*, 80 F.3d at 1281. The ALJ
10 predicated his rejection of Plaintiff's testimony entirely upon
11 "inconsistencies *in* the record as a whole." (AR 15 (emphasis added).)
12 Although testimony may be rejected because it is *internally*
13 inconsistent, *see Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir.
14 2001), or because it cannot be reconciled with *the medical record*, *see*
15 *Fair*, 885 F.2d at 604-605, the Agency has pointed to no authority that
16 would permit an ALJ to reject a claimant's testimony simply because
17 the record (exclusive of that testimony) contains inconsistencies.
18 Even if this flaw in the solitary, highly-general reason that the ALJ
19 offered for rejecting Plaintiff's testimony could be written off as
20 the casualty of a poorly-chosen conjunction, his reasoning cannot be.
21 Although the individual factors the ALJ considered--*i.e.*, the absence
22 of more drastic treatment for Plaintiff's knee impairment, the lack of
23 evidence of pharmacological side-effects, and evidence that Plaintiff
24 lives a fairly active lifestyle--were appropriate in the abstract,
25 none of his observations is supported by citations to the record; in
26 fact, several of the ALJ's observations fly in the face of contrary
27 evidence in that record. For example, contrary to the ALJ's finding
28 that Plaintiff "testified she has no problems standing," (AR 15), in

14

1    fact she testified the opposite.  (AR 491-92; *see also* AR 83.)  And

2    despite the ALJ's finding that the record contains "no evidence" of

3    significant adverse side effects, (*see* AR 15), a cursory review of the

4    record shows that Plaintiff's medication could (*see* AR 290) and did

5    cause side-effects.  (*See*, *e.g.*, AR 234 (noting Plaintiff's complaint

6    that her medications "made me sick"); 261 (recording Plaintiff's

7    complaint to her treating physician that her medications made her

8    "tired"); 324 (noting Plaintiff's report to her treating physician

9    that one of her medications made her "jittery").)  Finally, the ALJ's

10   observation that Plaintiff "leads a relatively active lifestyle" (AR

11   15) is contrary to the evidence that Plaintiff's limitations curtailed

12   many of her activities.  (AR 88-89, 193, 201-02.)  In sum, the ALJ's

13   adverse credibility determination does not articulate adequately clear

14   and convincing reasons for rejecting Plaintiff's testimony in light of

15   the many other impairments that the medical record establishes.

16        Furthermore, Ms. Wedgworth's comments in the Third-Party

17   Questionnaire were *not* entirely cumulative of testimony that the ALJ

18   rejected in his adverse credibility determination.  A fair reading of

19   the ALJ's rationale for his credibility finding indicates that he

20   discounted Plaintiff's testimony on only three specific points: (1)

21   her limited mobility; (2) the extent of her post-surgery knee

22   impairment; and (3) her experience of pharmacological side-effects.

23   (*See* AR 15.)  Ms. Wedgworth's comments covered some of these same

24   areas, but also corroborated Plaintiff's claims of uncontrolled pain

25   and depression.  (*See* AR 89-90.)  The ALJ's adverse credibility

26   determination did not discuss Plaintiff's claims of uncontrolled pain

27   or depression, (*see* AR 15), yet each of these impairments was

28   supported by the record. (*See* AR 140, 181, 193-94, 201-02, 231-32,

                                    15

259, 268, 460, 462.)  Where, as here, the ALJ finds some areas of a claimant's testimony incredible but does not mention other areas, the unmentioned testimony may be treated as established if it is otherwise supported by substantial evidence of record.  *See Holohan*, 246 F.3d at 1204 n.4.  Because the ALJ did not reject Plaintiff's testimony in its entirety, and because Ms. Wedgworth's comments in the questionnaire did not entirely overlap the portions of Plaintiff's testimony that the ALJ did reject,[5] this third-party evidence cannot be explained away by recourse to the ALJ's determination that *some* of *Plaintiff's* testimony was less than fully credible.

It is beyond dispute that the ALJ erred by disregarding the lay questionnaire submitted on Plaintiff's behalf by her sister, Linda Wedgworth.  *See Nguyen*, 100 F.3d at 1467.  And although some of Ms. Wedgworth's statements were cumulative of testimony that the ALJ apparently rejected, some of her other statements were not.  The ALJ's failure to address this third-party evidence cannot be salvaged by bootstrapping this error into an adverse credibility determination that ignored contradictory evidence in the medical record and was not coextensive with all of the assertions that the lay evidence contained.  Accordingly, on remand the ALJ must provide proper support for his credibility determination, and must explain what weight, if any, he gives Ms. Wedgworth's statements.

---

[5]  Had the ALJ credited Ms. Wedgworth's observations about Plaintiff's depression, for example, he might not have concluded that Plaintiff's mental impairment was non-severe.  (*See* AR 14.)  Thus, the Court cannot say that this oversight was harmless.  *See Batson*, 359 F.3d at 1197.

16

B.   The ALJ's Rejection Of Plaintiff's Claimed Pharmaceutical Side-
     Effects Failed To Acknowledge Contradictory Evidence Of Record

     Plaintiff also claims the ALJ did not properly evaluate the evidence supporting her claim that she suffers side-effects from her medications. (*See* Joint Stip. at 7-8.)  The Court agrees with Plaintiff, and concludes that the ALJ must rectify this error on remand.

     In assessing a claimant's medical condition, the ALJ must "investigate all avenues presented that relate to subjective complaints, including the claimant's prior work record and information and observations by treating and examining physicians and third parties." *See* S.S.R. 88-13 (1988)(*superceded by* S.S.R. 95-5p (1995).) This investigation includes, among other things, an inquiry into the "adverse side effects of any pain medication." *Id.*  The weight an ALJ gives a claimant's testimony regarding pharmacological side-effects will vary, depending upon how credible the claimant is generally. *See Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).  When the ALJ finds the claimant's testimony is generally not credible and the record does not otherwise support her claim of adverse side-effects, a general rejection of her testimony, if properly supported, is broad enough to include the rejection of her side-effect testimony. *Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002).  As the Ninth Circuit explained in *Thomas*,

     [The claimant] offers no objective evidence that her
     medications affected her concentration or caused dizziness.
     The only evidence regarding these symptoms is [the
     claimant's] own statements to her doctor and her testimony
     at the hearing.  While [the claimant's] testimony cannot be

17

1    rejected solely because the objective medical evidence does

2    not support the severity of her impairment, the ALJ properly

3    rejected her testimony by using "ordinary techniques of

4    credibility evaluation" and providing a specific, clear and

5    convincing reason, supported by the record, that her

6    testimony was generally not credible.

7  *Id.*  Where the medical evidence is devoid of any mention of

8  significant side effects, the ALJ is required to reject contrary

9  testimony.[6]   Conversely, when the medical record supports a claimant's

10  testimony about side-effects from her medications, the ALJ commits

11  reversible error by "glossing over" that evidence.  *See Janeway v.*

12  *Secretary of Health and Human Services*, 702 F.Supp. 795, 802 (C.D.

13  Cal. 1988).

14      In Plaintiff's case, reversal is required.  Before the hearing,

15  Plaintiff listed 11 prescription medications that she took on a daily

16  basis, and six more that she took on an "as needed" basis.  (*See* AR

17  100.)  At the hearing, Plaintiff testified that some of her

18  medications, or perhaps the combination of them, caused serious side-

19  effects.  (*See* AR 488, 495.)  As explained above, there is support

20  elsewhere in the medical record--beyond Plaintiff's testimony at the

21

22

23  ─────────────

24      [6]  *See Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985)

25  (requiring clinical evidence to support claims of impairment from drug
side effects); *see also Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th

26  Cir. 2001)(finding no substantial evidence of claimant's impairment
from medicinal side effects where the record contained "passing

27  mentions of the side effects of [the claimant's] medication in some of
the medical records, but there was no evidence of side effects severe

28  enough to interfere with [the claimant's] ability to work").

hearing--that her medications could and did cause side-effects.[7]  (*See* AR 234, 261, 290, 324.)  The ALJ may have overlooked this evidence when he found that "[t]here is *no* evidence of significant adverse side effects from medications impacting her ability to engage in work related tasks."  (AR 15 (emphasis added).)

Once again, the Agency falls back on the argument that the ALJ rejected Plaintiff's claim of side-effects as part and parcel of the adverse credibility determination.  (*See* Joint Stip. at 9.)  As explained above, the ALJ found that Plaintiff's testimony was "not totally credible."  (AR 17.)  And although the ALJ did specifically find that Plaintiff's claim of side-effects was incredible because the record contained "no evidence" of them (*see* AR 15), this finding ignores the medical evidence of record.  Though the Court must give deference to the ALJ's credibility assessment, he cannot justify negative credibility findings by "ignoring competent evidence in the record that suggests an opposite result."  *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).  That appears to be what happened here.

In sum, and contrary to the Agency's assertions, the record contains more than Plaintiff's "mere statements" at the hearing that her medicines caused side-effects.  (*See* Joint Stip. at 9.)  On remand, the ALJ must consider *all* of the evidence of Plaintiff's side-effects, and consider whether side-effects limited her ability to work.  If, after reconsideration of the evidence, the ALJ still concludes that Plaintiff's testimony regarding her side-effects was

---

[7]  Even Dr. Ostrow, the medical expert called by the ALJ, acknowledged that Plaintiff's medications could cause side-effects.

19

less than fully credible, he must offer reasons that are "specific, clear and convincing" for so doing, *see Smolen*, 80 F.3d at 1281, reconciling his findings with "competent evidence in the record that suggests an opposite result." *See Gallant*, 753 F.2d at 1456.

C.    The ALJ Must Seek Additional Evidence To Clarify The Treating Physician Evidence

Finally, Plaintiff criticizes the ALJ for neglecting to discuss the opinion of disability supposedly rendered by Dr. David Wood, one of her treating physicians. (*See* Joint Stip. at 3-4.) After reviewing the record, the Court concludes that, on remand, the ALJ must resolve an apparent ambiguity in the medical evidence relating to Plaintiff's treating physician.

The applicable regulations require that the ALJ give special weight to the treating physician's opinion. *See Andrews v. Shalala*, 53 F.3d 1035, 1040-41 (9th Cir. 1995). A treating physician's opinion on the nature and severity of an impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2). The ALJ must offer specific and legitimate reasons to reject the opinions of treating physicians. *See Lester*, 81 F.3d at 830. A treating physician's opinion "on the ultimate issue of disability" must itself be credited unless it can be rejected for clear and convincing reasons. *See Holohan*, 246 F.3d at 1202-03.

In Plaintiff's case, Dr. David L. Wood--her treating physician--performed an hour-long examination of Plaintiff and a review of her medical records in mid-1999. (*See* AR 180-91.) At that time, Plaintiff was complaining of an injury to her right arm and "'constant

20

1   pain, throbbing, and pressure' in [her] left knee," which pain was
2   exacerbated by, among other things, prolonged sitting.  (AR 180-81.)
3   Dr. Wood noted slightly decreased flexion in Plaintiff's left knee.
4   (*See* AR 187.)  On June 15, 1999, Dr. Wood drafted and signed a report
5   memorializing his observations; therein he concluded that Plaintiff's
6   condition was "permanent and stationary," and opined that she was a
7   "qualified injured worker."[8]  (AR 188-89.)

8           On July 3, 2002, an orthopedic re-evaluation was performed at Dr.
9   Wood's office.  (AR 475-79.)  The examination itself, however, was
10  performed by Mr. Rolf J. Marol, P.A. "in lieu of [Dr.] Wood."  (*See* AR
11  475.)  Among other things, Mr. Marol's examination showed an
12  increasingly-limited range of flexion in Plaintiff's left knee which
13  made her incapable of squatting.  (*See* AR 477.)  X-rays showed
14  abnormalities in her left knee, so Mr. Marol recommended that
15  Plaintiff obtain an MRI study to ascertain the extent of the damage.
16  (*See* AR 477-78.)  Mr. Marol also noted that Plaintiff complained of
17  "increased pain" in her knee, and stated that her condition could
18  require additional cortisone injections or even a third surgery,
19  pending the MRI results.  (AR 478.)  Finally, Mr. Marol concluded that
20  Plaintiff was "temporarily totally disabled."  (AR 478.)  On July 23,
21  2002, Mr. Marol prepared and signed a report stating these
22  conclusions, which was entitled "Primary Treating Physician's Progress
23  Report."  (AR 475, 479.)  On that same date, Dr. Wood reviewed and
24  signed the report.  (*See* AR 479.)

25
26
27  _____

28          [8]  This report was prepared for Plaintiff's state disability
    case.

                                    21

1    Five months later, on January 21, 2003, Dr. Wood examined
2  Plaintiff himself and issued a "Primary Treating Physician's Permanent
3  And Stationary Report." (*See* AR 459-65.)  In that report, Dr. Wood
4  noted that Plaintiff had received three cortisone injections in her
5  knee since her last visit; although she reported some improvement in
6  her symptoms, she "still continue[d] to be symptomatic," and reported
7  "some new and further problems with her knee." (AR 460, 462.)  The
8  physical examination revealed most of the same limitations that had
9  been observed in the July 2002 report, although her range-of-motion
10  impairment in her left leg had worsened. (*See* AR 461-62.)  Dr. Wood
11  stated that, based on Plaintiff's complaints, he would characterize
12  her pain as "constant slight to moderate frequently becoming
13  moderate," and noted that--if her pain continued to intensify--she
14  could require a total knee replacement surgery. (*See* AR 463.)  The
15  physician then stated that Plaintiff should be excluded from heavy
16  work, and opined that she could "still be considered a qualified
17  injured worker." (AR 463.)  In light of the July 2002 report,
18  however, Dr. Wood's parting comment was perplexing:

19        The increase in [Plaintiff's] disability can be attributed
20        to new and further progression of [her] underlining [*sic*]
21        condition.  The remainder of my opinions with regard to
22        causation and apportionment are unchanged from my permanent
23        and stationary treating physician's report dated June 7,
24        1999.

25  (AR 464.)  Unlike the July 2002 report, Dr. Wood completed and signed
26  the January 2003 report himself. (*See* AR 464.)

27    The ALJ did not mention either the June 1999 report or the July
28  2002 report in his decision. (*See* AR 11-18.)  The ALJ did, however,

mention the January 2003 report, but his discussion of that document was limited to his observation that "Dr. Wood found [Plaintiff] to be precluded only from heavy work." (*See* AR 15.)   Plaintiff complains that the decision ignored the July 2002 report, and insists that the ALJ was required to reconcile his decision with that report's statement that Plaintiff was "temporarily totally disabled." (*See* Joint Stip. at 3.)   The Agency counters that the July 2002 report was not entitled to the weight usually afforded treating physician opinions because it was completed by Mr. Marol, a physician's assistant. (*See* Joint Stip. at 4-5.)

Although Mr. Marol is not a doctor, and even though he apparently did complete the July 2002 report on the basis of his own observations of Plaintiff, the applicable regulation provides that "[a] report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence." *See* 20 C.F.R. § 416.913(a)(6).   The Ninth Circuit has interpreted this regulation to mean that a non-physician's observations are properly considered part of the treating physician's opinion where the non-physician "worked closely under the supervision of [the treating physician]" and "was acting as an agent of [the treating physician] in [his] relationship with" the claimant. *See Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996).   Here, Dr. Wood apparently authorized Mr. Marol to conduct Plaintiff's examination "in lieu of" him (*see* AR 475), and Dr. Wood thereafter reviewed and signed the July 2002 report without qualification. (AR 479.)   The record leaves little doubt that the July 2002 report was meant to be that of Dr. Wood: the declaration on the penultimate page, which is written in the first-person, is clearly that of Dr. Wood, and not Mr. Marol.

1  (*See* AR 478.)  All of these considerations suggest that Mr. Marol

2  arguably was acting as part of an "interdisciplinary team" when he

3  drafted the July 2002 report.  *See Gomez*, 74 F.3d at 971.

4       Inexplicably, however, Dr. Wood appeared to have overlooked or

5  forgotten the June 2002 report when he drafted the January 2003

6  report; otherwise, he would not have noted that his opinion in January

7  2003 remained "unchanged from [the] [...] treating physician's report

8  dated June 7, 1999."  (AR 464.)  The ALJ should not have ignored this

9  stark ambiguity in the evidence provided by Plaintiff's treating

10 physician.

11      The Court concludes that the ALJ must ask Dr. Wood to clarify his

12 opinions.  The ALJ in a social security case has an independent "duty

13 to fully and fairly develop the record and to assure that the

14 claimant's interests are considered," even where a claimant is

15 represented by counsel.  *See Tonapetyan*, 242 F.3d at 1150 (internal

16 quotation marks omitted).  That duty is triggered by ambiguous or

17 inadequate evidence in the record.  *Id.; see also Mayes v. Massanari*,

18 276 F.3d 453, 459-60 (9th Cir. 2001).  Where, as in this case, there

19 are ambiguities in the treating physician's opinion, the proper

20 approach was for the ALJ to make an additional inquiry into the basis

21 for the doctor's opinion and leave the record open for the doctor's

22 response.  *See Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998).

23      Because more factual information is needed to determine the

24 weight that should be given the July 2002 report, the Court will not

25 pass judgment on that particular issue.  Instead, the Court concludes

26 that, because the apparent inconsistency in Dr. Wood's opinions cannot

27 be resolved on this record, on remand the ALJ must re-contact this

28 physician and ask him to confirm that the July 2002 report accurately

24

1  reflected *his own opinion* at the time he signed it.  If so, Dr. Wood
2  must be asked to reconcile the July 2002 report with the January 2003
3  report.  If, on the other hand, Dr. Wood disavows the July 2002
4  report, it bears emphasis that--even if the opinion of disability in
5  that report is creditable to Mr. Marol alone--the ALJ must
6  specifically articulate his reasons, if he intends to reject that lay
7  opinion.  *See Dodrill*, 12 F.3d at 919.
8  D.   <u>Remand Is Appropriate</u>
9       The determination whether to remand for further proceedings or
10 for payment of benefits lies within the discretion of the Court.
11 *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  In most
12 circumstances in Social Security disability cases, remand is
13 appropriate.  *See Moisa v. Barnhart*, 367 F.3d 882, 886-87 (9th Cir.
14 2004).  Remand may be productive where additional proceedings can
15 remedy defects in the original administrative proceedings.  *See Celaya*
16 *v. Halter*, 332 F.3d 1177, 1184 (9th Cir. 2003)(ordering "remand to the
17 ALJ for a proper step-four analysis").
18      In this case, as explained above, the ALJ erred by failing to
19 address the lay evidence provided by Ms. Wedgworth and by overlooking
20 evidence in the medical record tending to corroborate Plaintiff's
21 testimony that she suffers side-effects from her medications.
22 Although unchallenged here, the ALJ's credibility determination was
23 completely devoid of citation to the record; indeed, this Court's
24 review of the record finds conflicting evidence on several points.
25 Finally, the ALJ failed to fulfill his duty to develop the record to
26 reconcile the treating physician's opinion that Plaintiff could
27
28

perform all but heavy work as of January 2003, with a document that may or may not have reflected his opinion that she was totally disabled just six months earlier.

Remand is, therefore, necessary to enable the ALJ to render a new decision.  First, the ALJ must revisit his credibility determination and offer a *clear* explanation of which portions of Plaintiff's testimony he accepts, and which parts (if any) he rejects.  For any testimony that the ALJ rejects, he must offer reasons that are "specific, clear and convincing."  *See Smolen*, 80 F.3d at 1281.  Part of the ALJ's reconsideration of Plaintiff's credibility will require him to re-examine Plaintiff's testimony regarding her side effects; if still inclined to reject that testimony, the ALJ must reconcile that stance with any conflicting material evidence in the medical record. Next, and after reassessing Plaintiff's credibility, the ALJ must either accept the lay testimony, or "giv[e] specific reasons germane to each witness" if he decides to reject it.  *See Regennitter v. Commissioner of Social Sec. Admin.,* 166 F.3d 1294, 1298 (9th Cir. 1999)(citing *Smolen*).  Finally, the ALJ must fulfill his duty to develop the medical record.  *See Tonapetyan*, 242 F.3d at 1150.  This means that, at a minimum, the ALJ must re-contact Dr. Wood and ask him to (1) confirm that the July 2002 report accurately reflected his own opinion at the time he signed it and, if it did, (2) reconcile the opinion of disability in the July 2002 report with the much less dismal opinion in Dr. Wood's January 2003 report.  The weight that the ALJ gives the July 2002 report will depend upon whether Dr. Wood claims or disavows the July 2002 report.  Above and beyond the

1  specific areas that the Court has identified, the ALJ may find further
2  development of the record necessary or helpful to complete these tasks
3  on remand.

4                                    V.

5                               CONCLUSION

6        For all the foregoing reasons, the Agency's decision is reversed
7  and the case is remanded for further proceedings consistent with this
8  Memorandum Opinion and Order.

9

10       IT IS SO ORDERED.

11       DATED:     December ___7___, 2005.

12

13                                        /s/

14                              _____
                                PATRICK J. WALSH
15                              UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28  S:\PJW\Cases-Soc Sec\ROSALES, G 1242\Memo Opinion.wpd